IN THE UNITED STATES DISTRICT COURT
NORTHISN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID AXMANN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-01635-N |
| | § | |
| U.S. ANESTHESIA PARTNERS HOLDINGS, INC., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This Order addresses Defendants U.S. Anesthesia Partners Holdings, Inc. and U.S. Anesthesia Partners of Texas, P.A.'s (collectively, "U.S. Anesthesia") motion for summary judgment [41] and Plaintiff David Axmann's motion for leave to file a surreply [52]. First, the Court grants Axmann leave to file a surreply in response only to U.S. Anesthesia's objections to his evidence and accordingly considers that section of his surreply here.[1] Second, because U.S. Anesthesia has shown that there is no genuine dispute as to any material fact, the Court grants the motion for summary judgment.

## I. ORIGINS OF THE DISPUTE

This is an employment discrimination case. Axmann alleges that his previous employer, U.S. Anesthesia, discriminated and retaliated against him in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA").

[1] The Court may grant leave to file a surreply to afford the nonmovant an opportunity to respond to newly asserted arguments. *Lombardi v. Bank of Am.*, 2014 WL 988541, at *3 (N.D. Tex. 2014).

Pl.'s Second Am. Compl. ¶¶ 18–19 [26]. Axmann was sixty-four years old when U.S. Anesthesia terminated him. *See* Pl.'s App. 052 [48].

Between 2014 and 2024, the percentage of anesthesiologists over forty years old in the North Texas region of U.S. Anesthesia decreased from one hundred percent to sixty-six percent and the percentage of anesthesiologists over sixty years old decreased from about fifty percent to twenty percent. Pl.'s Resp. Br. 8 [47] (citing Pl.'s App. 162–209). Further, the average age of anesthesiologists decreased from fifty-eight to forty-seven. *Id.*

Axmann was an anesthesiologist at U.S. Anesthesia and worked under the supervision of Dr. Matthew Engels. Defs.' App. 137 [43]. It is common for surgeons to request that certain anesthesiologists not be assigned to their cases; people refer to the list of anesthesiologists a surgeon does not want to work with as a "no-list." Pl.'s App. 287–88. At least thirty-six surgeons placed Axmann on their no-lists; most anesthesiologists are on four or fewer no-lists. Defs.' App. 89, 161 (Dr. Engels Deposition: "[A]lmost everybody has three or four or less."); Pl.'s App. 242 (Dr. Simon Deposition: "I've never heard of another anesthesiologist who has 37 doctors [who have placed him] on a no-list."). Because an unusually high number of surgeons requested to not work with Axmann, it became hard to schedule him for surgeries. Defs.' App. 137. In May 2020, Dr. Engels reached out to Ashlee Tharp, the Human Resources Director, about the concerns he had received regarding Axmann. *Id.* at 201–02. In addition to the no-list and related scheduling difficulties, Dr. Engels listed complaints of Axmann having inappropriate discussions with patients; canceling cases; showing up late; lacking confidence in the operating room; being difficult to reach; sleeping in a day-surgery room during the day; and making slightly-

higher-than-normal narcotics requests. *Id.* at 201. Then, in July, Tharp and Dr. Stuart Simon — Chairman of the Human Resources Committee ("HRC") and member of the Clinical Governance Board ("CGB"), which makes employment decisions — met with Axmann to discuss the concerns. *Id.* at 80, 206–09.

Following the meeting, on August 5, Tharp emailed Axmann to let him know that the CGB requested that he undergo professional behavior coaching with Dr. David Teegarden for one year. Defs.' App. 211. Dr. Teegarden is a physician coach to whom the CGB has referred other anesthesiologists; almost all of them successfully completed coaching and continued working at U.S. Anesthesia. *Id.* at 082–84. Axmann replied a few days later, demanding documentation to support each complaint made against him. *Id.* at 216–17. Then, on August 16, Axmann for the first time raised his belief that U.S. Anesthesia was targeting him for being one of the oldest and most senior doctors at the practice. *Id.* at 032, 219. On September 8, Axmann sent a follow-up email, reiterating his request for documentation and concern that "someone [was] trying to push [him] into early retirement." *Id.* at 224. Tharp replied on September 23 that the CGB approved the requirement that he attend coaching with Dr. Teegarden as a condition of his continued employment. *Id.* at 223. She also sent him a "non-exhaustive, summary list" of the performance issues in response to his request for documentation. *Id.* On September 28, Axmann again requested an "exhaustive/comprehensive list" of the complaints and requested that any review or coaching be with a "mutually agreed upon individual, not simply someone selected without [his] consent." *Id.* at 226–27. He repeated that he

believed the "complaints [were] without merit and simply a pretext intended to force [him] into early retirement." *Id.* at 226.

Also in September, an incident happened at a facility in Addison in which "Axmann was not able to perform a regional block due to skill set." Defs.' App. 230; *see also* Pl.'s App. 027–28. After the incident, the Addison facility requested that Axmann no longer be assigned to it. Defs.' App. 229. The facilities have the authority to grant and revoke privileges at their locations. *See* Pl.'s App. 016 (Axmann Deposition: "It would run through a very standard application process. . . . I was chairman at . . . Medical Center of Plano for many years, on the board there. And I routinely signed off on dozens of charts with new applications for people."), 315 (Dr. Holliday[2] Deposition: "The facilities have the decision-making authority of whether they want to grant credentials or not."). The Addison facility's directive made scheduling Axmann more challenging for U.S. Anesthesia because the main surgeon Axmann worked with was Dr. Richard Reitman, a surgeon at the Addison facility. Defs.' App. 229.

In November 2020, the HRC invited Axmann to have a peer-to-peer meeting to discuss Axmann's concerns of discrimination and why he did not want to meet with Dr. Teegarden, but Axmann would not attend without his attorney, so the meeting did not happen. *Id.* at 149, 233–36. The CGB then decided to continue with Dr. Teegarden because of his success with other physicians, and Tharp informed Axmann of this in early January 2021. *Id.* at 109, 238. She stated that completing coaching with Dr. Teegarden

---

[2] Dr. James Holliday has been the Chairman of the CGB since 2014. Defs.' App. 136.

was "a condition of [Axmann's] continued employment" and to let U.S. Anesthesia know by January 8 if he would participate. *Id.* at 238. Axmann again refused to attend coaching and stopped answering his phone in the weeks before he was fired. Pl.'s App. 291. So, the CGB voted on January 29, 2021, to terminate Axmann's employment pursuant to the without-cause provision of his employment agreement. Defs.' App. 240.

U.S. Anesthesia now moves for summary judgment on Axmann's claims of age discrimination and retaliation.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no

evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Bargher v. White*, 928 F.3d 439, 444 (5th Cir. 2019) (citation omitted). Factual controversies are resolved in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

## IV. THE COURT GRANTS SUMMARY JUDGMENT ON THE AGE DISCRIMINATION CLAIM

"The ADEA . . . prohibit[s] an employer from discharging an employee on account of that employee's age." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Axmann does not offer direct evidence of his age discrimination claim, so the Court applies the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015). Axmann must first make out a prima facie case of age discrimination by showing he was (1) discharged; (2) qualified for the position; (3) within the protected class at the time of termination; and (4) replaced by someone outside the protected class, replaced by someone younger, or otherwise terminated because of his age. *Jackson v. Cal-*

*Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (citation omitted). The parties dispute whether Axmann has satisfied the fourth element of his prima facie case.

If Axmann successfully makes out a prima facie case, the burden shifts to U.S. Anesthesia to articulate a legitimate, nondiscriminatory reason for Axmann's termination. *Goudeau*, 793 F.3d at 474. Then, the burden shifts back to Axmann to show that there is a genuine issue of material fact as to whether U.S. Anesthesia's reason was merely pretextual. *Id.* (citing *Squyres*, 782 F.3d at 231).

***A. Axmann Has Established a Prima Facie Case of Age Discrimination***

U.S. Anesthesia contends that Axmann has no evidence beyond his own subjective, unsubstantiated belief that he was replaced by someone outside the protected class, replaced by someone younger, or otherwise terminated because of his age. Defs.' Mot. Br. 13 [42]. The Court disagrees. Axmann presents statistical evidence of trends of the average age of anesthesiologists decreasing significantly and the ratio of younger anesthesiologists and nurse anesthetists growing in relation to the proportion of older anesthesiologists. Pl.'s Resp. Br. 8–9, 28; Pl.'s App. 162–209. The Court finds that this statistical evidence establishes the fourth element of Axmann's prima facie case. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 882 (5th Cir. 2003) (explaining that statistical evidence buttresses a plaintiff's prima facie age discrimination case (quoting *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1071 (5th Cir. 1981))); *see also Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (citation omitted) ("To establish a prima facie case, a plaintiff need only make a very minimal showing."). Accordingly, the Court determines that Axmann has made out a prima facie case of age discrimination.

### *B. U.S. Anesthesia Has Produced a Legitimate, Nondiscriminatory Reason for Termination*

Because Axmann established his prima facie case, the burden shifts to U.S. Anesthesia to articulate a legitimate, nondiscriminatory reason for the termination. U.S. Anesthesia states that it terminated Axmann because, after requiring that he attend professional behavior coaching with Dr. Teegarden because of the unprecedented no-list and numerous complaints against him, Axmann refused to participate in the coaching. Defs.' Mot. Br. 17. The Court finds this reason is sufficient to meet U.S. Anesthesia's burden. *See LeMaire v. La. Dept. of Transp. and Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (finding failure to follow employer directive a legitimate reason in retaliation context); *Blair v. Harris Cnty.*, 2020 WL 1234637, at *2 (S.D. Tex. 2020) (finding failure to agree to performance improvement plan a legitimate reason for termination).

### *C. Axmann Has Not Raised a Fact Issue Regarding Pretext*

Because U.S. Anesthesia has produced legitimate, nondiscriminatory reasons for the termination, the burden shifts back to Axmann to show by a preponderance of the evidence that the reasons offered by U.S. Anesthesia were a pretext for discrimination. *See Squyres*, 782 F.3d at 231 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)). Viewing the evidence in the light most favorable to Axmann, the Court concludes that he fails to provide a basis on which a reasonable jury could find that U.S. Anesthesia's proffered reasons were pretextual.

First, Axmann argues that his continued employment for months after U.S. Anesthesia first became aware of the concerns about him suggests that the concerns

were not legitimate or valid. Pl.'s Resp. Br. 36. However, Dr. Engels noted in an email in May 2020 that he was "not aware of any bad patient outcomes caused by [Axmann's] care, but the number of issues must be addressed." Defs.' App. 201. This indicates that U.S. Anesthesia had concerns regarding Axmann's performance but did not see Axmann's continued employment as an immediate threat to patients and hoped that with coaching, his performance issues would improve. Accordingly, the fact that U.S. Anesthesia did not immediately terminate Axmann is not evidence on which a jury could reasonably infer pretext.

Second, Axmann asserts that U.S. Anesthesia provided "three separate inconsistent explanations" for Axmann's termination, and that the conflicting explanations create a triable issue of pretext. Pl.'s Resp. Br. 35. U.S. Anesthesia terminated Axmann pursuant to the without-cause provision of his employment agreement because of the numerous concerns about him and his refusal to meet with Dr. Teegarden. *See supra* Part IV(b). The Court does not find these reasons to be inconsistent. U.S. Anesthesia referred Axmann to Dr. Teegarden because of the concerns about him, and states that it terminated him because he refused to undergo coaching with Dr. Teegarden to address the concerns. Further, it is permissible for U.S. Anesthesia to terminate his employment "without cause" pursuant to his employment agreement while still having a reason for his termination, as the "without cause" designation pertains to the contractual process for the termination.[3]

---

[3] Dr. Holliday explained that U.S. Anesthesia decided to terminate Axmann "without cause" because of "the secondary and tertiary consequences of reporting to the National Practitioner Database and the potential consequences of him . . . continuing to practice." Defs.' App. 146–47.

Third, Axmann argues that U.S. Anesthesia's nonadherence to the Code of Conduct's disciplinary action policy when disciplining Axmann is evidence of pretext. Pl.'s Resp. Br. 18–19, 36–37. The Code of Conduct includes a disciplinary action policy listing a standard process for handling complaints of acts not in compliance with the Code. Pl.'s App. 273. Several of the complaints made against Axmann involved alleged conduct not in compliance with the Code. *See* Defs.' App. 201–02. But the Code stipulates that the disciplinary action policy "is a general guideline," and the CGB "retains the right to determine the appropriate remedial action to be taken in each complaint." Pl.'s App. 278. Accordingly, because U.S. Anesthesia was not required to follow the disciplinary action policy, its departure from the policy in disciplining Axmann is not evidence of pretext.

Fourth, Axmann argues that the subjective nature of the complaints against him and U.S. Anesthesia's reliance on testimonial evidence to establish the complaints show pretext. Pl.'s Resp. Br. 37. As an initial matter, in addition to testimonial evidence, U.S. Anesthesia produced emails from May 2020 supporting the existence of the complaints. Defs.' App. 201–02. Further, in cases where the employer takes an adverse action against an employee "based on complaints lodged by . . . other employees, . . . the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993). Nothing in the record suggests that U.S. Anesthesia did not refer Axmann to coaching, and eventually terminated him for his failure to attend coaching, because of its good-faith belief in the numerous complaints and

unusually high no-list.[4] Accordingly, the Court finds that the subjective nature of the complaints against Axmann and U.S. Anesthesia's use of testimonial evidence do not suggest pretext.

Fifth, Axmann claims that the "prejudged nature of the" circumstances leading to Axmann's termination is evidence of pretext. Pl.'s Resp. Br. 38. However, the summary judgment record does not support that Axmann's termination was inevitable; U.S. Anesthesia told Axmann several times that he had to attend professional behavior coaching with Dr. Teegarden in order to continue his employment. Defs.' App. 211 (August 2020), 223 (September 2020), 238 (January 2021). And U.S. Anesthesia scheduled a meeting with him to discuss others' complaints about him, his opposition to coaching with Dr. Teegarden, and his complaints of age discrimination, but he did not attend the meeting. *Id.* at 149, 233–36. Accordingly, the Court holds that U.S. Anesthesia's decision was not predetermined and thus does not find a triable issue of pretext on these grounds.

Lastly, Axmann asserts that another basis for pretext is that U.S. Anesthesia's explanation for the termination is unworthy of credence. Again, the evidence does not

[4] Axmann argues that the no-list and other complaints by employees are inadmissible hearsay. Pl.'s Resp. Br. 2–3; 37. The Court disagrees; U.S. Anesthesia offers these statements not for the truth of the matter asserted, but for their impact on its decision-making. Defs.' Reply Br. 7 n.2 [51]; *see also Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 301 (5th Cir. 2020) (unpub.) (affirming that customer complaint forming basis of employer's termination decision was not hearsay because it was offered for impact on decisionmaker (citing *United States v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984))).

support that U.S. Anesthesia's explanation is unworthy of credence, and the Court determines that these grounds do not support a finding of a triable issue of pretext.[5]

Thus, because there is no genuine issue of material fact as to whether U.S. Anesthesia's reasons for terminating Axmann were merely pretextual, the Court grants summary judgment for U.S. Anesthesia on Axmann's age discrimination claim.

## IV. THE COURT GRANTS SUMMARY JUDGMENT ON THE RETALIATION CLAIM

The ADEA also prohibits an employer from discriminating against an employee for opposing an unlawful practice or asserting a charge, testifying, assisting, or participating in an ADEA proceeding or investigation. 29 U.S.C. § 623(d). "The analytical framework for a retaliation claim is the same as that used in the employment discrimination context." *Goudaeu*, 793 F.3d at 478 (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). To establish a prima facie retaliation case, Axmann must show that (1) he engaged in a protected activity; (2) he suffered an adverse employment decision; and (3) there is a causal link between the protected activity and the adverse employment decision. *Id.* If Axmann successfully makes out a prima facie case, the burden shifts to U.S. Anesthesia to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). Then, the burden shifts back to Axmann to show that there is a genuine issue of material fact as to whether U.S. Anesthesia's reason is a pretext for retaliation. *Id.*

[5] To the extent Axmann also relies on his statistical evidence as evidence of pretext, the Court rejects this argument. *See, e.g.*, *Manning*, 332 F.3d at 882 (finding statistical evidence alone does not demonstrate pretext).

Axmann engaged in protected activity for the first time on August 16, 2020, when he emailed Tharp that he believed U.S. Anesthesia was targeting him because of his age. Defs.' App. 219. Axmann alleges that the adverse employment decisions U.S. Anesthesia took against him include that it (1) did not respond to Axmann's complaints of discrimination; (2) revoked his privileges at two facilities; (3) did not withdraw its threat of termination; and (4) eventually terminated him.[6] Pl.'s Resp. Br. 22, 43.

First, the Court finds that the record does not support Axmann's allegation that U.S. Anesthesia did not respond to his complaints of discrimination; the HRC responded to Axmann's concerns by scheduling a meeting to discuss them, but he refused to attend without his attorney. Defs.' App. 149, 233–36. The Court does not consider this response to be an adverse decision.

Second, Axmann asserts that his loss of privileges at facilities constitutes an adverse employment decision by U.S. Anesthesia. Pl.'s Resp. Br. 22–23. However, the record shows that the facilities made these decisions, not U.S. Anesthesia. *See* Pl.'s App. 016, 315. Accordingly, Axmann's loss of privileges does not constitute an adverse employment decision by U.S. Anesthesia.

Third, Axmann argues that the fact that U.S. Anesthesia "never withdrew the threat of termination" is an adverse employment decision. Pl.'s Resp. Br. 22. The Court assumes that the "threat of termination" Axmann is referring to is U.S. Anesthesia's describing

[6] To the extent Axmann argues that U.S. Anesthesia's purported failure to follow the disciplinary action policy in the Code of Conduct is an adverse employment decision, *see* Pl.'s Resp. Br. 22, the Court rejects this argument for the reasons described previously. *See supra* Part IV(C).

professional behavior coaching with Dr. Teegarden as a condition of continued employment. *See id.* at 15. However, U.S. Anesthesia first demanded that Axmann undergo coaching on August 5, 2020, before Axmann engaged in any protected activity. Defs.' App. 211–12. Accordingly, because U.S. Anesthesia imposed the condition upon Axmann before he engaged in protected activity, Axmann cannot establish a causal link between his protected activity and the condition of continued employment. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1000 (5th Cir. 2022) (affirming summary judgment on retaliation claim because protected activity happened after adverse employment decision). And U.S. Anesthesia's decision to keep the condition of continued employment in place is not evidence of causality, either. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (Employers' "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Thus, there is no causal link between the protected activity and U.S. Anesthesia's decision to continue to impose the condition of continued employment.

Lastly, Axmann argues that there is a causal link between Axmann's protected activity and his termination. Pl.'s Resp. Br. 43. The Fifth Circuit suggested that three months between the protected activity and the adverse employment decision is insufficient to show causation. *Garcia v. Prof. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (citing *Breeden*, 532 U.S. at 273–74). Here, over four months passed between Axmann's protected activity and his termination; this is insufficient to suggest causation. *See id.* Axmann cannot prove that there is a causal link between his protected activity and the termination. Accordingly, Axmann has not established a prima facie case of retaliation.

Even if Axmann could establish a prima facie case of retaliation, for the reasons previously discussed, U.S. Anesthesia provided a legitimate reason for the adverse employment decisions, and Axmann cannot establish that U.S. Anesthesia's reasons were merely pretextual.[7] *See supra* Part IV.C. Accordingly, because Axmann cannot establish a prima facie case of retaliation, or alternatively cannot establish pretext, the Court grants U.S. Anesthesia summary judgment on Axmann's retaliation claim.

**CONCLUSION**

Because Axmann has not raised a genuine dispute of material fact regarding whether U.S. Anesthesia's reasons for terminating him were merely a pretext for discrimination, the Court grants summary judgment to U.S. Anesthesia on the age discrimination claim. Further, because Axmann failed to establish a prima facie case of retaliation, the Court grants summary judgment to U.S. Anesthesia on the retaliation claim.

Signed January 14, 2025.

David C. Godbey
Chief United States District Judge

[7] Axmann raises the same arguments for finding pretext in his retaliation claim as he did in his discrimination claim. *See* Pl.'s Resp. Br. 46–47.